Vito GIACALONE, Petitioner-Appellant,

v.

William LUCAS, Sheriff, Respondent-Appellee.

No. 20707.

United States Court of Appeals, Sixth Circuit.

July 30, 1971.

Joseph W. Louisell, Detroit, Mich., for petitioner-appellant.

Stewart H. Freeman, Asst. Sol. Gen., Lansing, Mich., for respondent-appellee; Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., on brief.

Before PHILLIPS, Chief Judge, and CELEBREZZE and McCREE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This appeal is of an order of the United States District Court for the Eastern District of Michigan dismissing, without a hearing, the Appellant's petition for writ of habeas corpus. The petition arises out of the Appellant's conviction, by a jury, for unlawful possession of a blackjack, Mich.Stat.Ann. § 28.421, M.C. L.A. § 750.224 (1960), and the imposition of a four-year nine-month to five-year prison sentence upon him. During and after his trial, the Appellant raised the following issues, *inter alia:* first, whether the state trial judge's refusal to grant the Appellant a continuance until

his chief counsel was released from the hospital, where he was undergoing diagnostic tests, deprived the Appellant of due process of law; second, whether the search of the Appellant's home, incident to his arrest, which resulted in the discovery and seizure of the blackjack, was unreasonable. These issues were treated in a scholarly, 100-page series of unreported opinions by the trial judge, Honorable Victor J. Baum; they were considered by the Michigan Court of Appeals, which affirmed the Appellant's conviction, People v. Giacalone, 23 Mich. App. 163, 178 N.W.2d 162 (1970); and by the Michigan Supreme Court, 383 Mich. 786 (1970), which denied the Appellant's motion for leave to appeal, two justices dissenting. Having exhausted his state remedies, the Appellant sought habeas corpus in the District Court. Having lost there, he appeals to this Court. We affirm.

## I.

■ A motion by a criminal defendant for a continuance of the trial until his retained counsel can be present is directed to the sound discretion of the trial court. Ungar v. Sarafite, 376 U.S. 575, 589–590, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); Kobey v. United States, 208 F.2d 583, 592–594 (9th Cir. 1953); United States v. Arlen, 252 F.2d 491 (2d Cir. 1958). Cf. Callahan v. Russell, 423 F.2d 450, 454–456 (6th Cir. 1970); United States v. Knight, 443 F.2d 174 (6th Cir. 1971).

■ Proper exercise of this discretion requires a delicate balance between the defendant's right to adequate representation of counsel at trial, and the public interest in the prompt and efficient administration of justice. On the one hand, a court may not insist upon expeditiousness for its own sake, but, on the other, a defendant cannot be allowed to insist upon unreasonable delay or inconvenience in the completion of his trial. What is a reasonable delay varies depending upon all the surrounding facts and circumstances. Williams v.

United States, 332 F.2d 36 (7th Cir. 1964), cert. denied, 379 U.S. 976, 85 S. Ct. 672, 13 L.Ed.2d 566; Mende v. United States, 282 F.2d 881 (9th Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365, reh. denied, 365 U.S. 825, 81 S.Ct. 689, 5 L.Ed.2d 704; Relerford v. United States, 309 F.2d 706, 708 (9th Cir. 1962); Relerford v. United States, 288 F.2d 298, 301–302 (9th Cir. 1961); Lee v. United States, 98 U.S.App.D.C. 272, 235 F.2d 219, 221 (1956); Shores v. United States, 80 F.2d 942 (9th Cir. 1936), cert. denied, 297 U.S. 705, 56 S. Ct. 501, 80 L.Ed. 993; Lias v. United States, 51 F.2d 215 (4th Cir. 1931), aff'd per curiam, 284 U.S. 584, 52 S.Ct. 128, 76 L.Ed. 505; Hardie v. United States, 22 F.2d 803 (5th Cir. 1927), cert. denied, 276 U.S. 636, 48 S.Ct. 421, 72 L. Ed. 744. Some of the factors to be considered in the determination of reasonableness are: the length of the delay requested; whether the lead counsel has associates prepared to try the case in his absence; whether other continuances have been requested and received; the convenience or inconvenience to litigants, witnesses, opposing counsel, and the court; whether the delay seems to be for legitimate reasons, or whether it is purposeful and dilatory; and other relevant factors. Considering the totality of circumstances in the instant case, we believe that the trial ·judge's refusal to grant a continuance until the Appellant's chief counsel, Mr. Joseph W. Louisell, left the hospital where he was undergoing diagnostic tests for a heart condition, was proper, and that it did not infringe upon the Appellant's constitutional rights.

The Appellant was arrested on May 14, 1968 and charged with the unlawful possession of a blackjack. The case was docketed before the Michigan Circuit Court for trial on October 14, 1968, however, the trial judge granted a defense request for a continuance until October 21, 1968, in order that Mr. Louisell have an opportunity to prepare and argue another case that week. One other continuance for the convenience of defense

counsel was granted by the trial court before the case ultimately came to trial.

At the time the Appellant was arrested and charged with possession of the blackjack, he was also charged with two other felonies. The task of docketing these three cases for trials at times when Mr. Louisell would be available proved to be a formidable one. For one reason, Mr. Louisell suffered from a heart condition, which required attention. On September 2, 1968, Mr. Louisell completed arrangements to enter the Ann Arbor, Michigan hospital for certain non-emergency, diagnostic tests on Sunday, November 10, 1968. Compounding the problem further was the fact that Mr. Louisell had a very heavy caseload. In particular, Mr. Louisell was defense counsel in a criminal case in the federal court in Detroit, which was to be tried in November. The district judge to whom the federal case had been assigned anticipated that it would be a protracted affair, with over two hundred witnesses.

After some delicate negotiations, an agreement was reached between Mr. Louisell, the trial judge, and the district judge, under which the four cases in which Mr. Louisell was defense counsel could be heard within a reasonable time, and without interfering with each other or with Mr. Louisell's appointment in Ann Arbor. Under the agreement, to which Mr. Louisell gave complete assent, the Appellant would be tried on the first of his charges in early November, then tried on the blackjack charge on Thursday, November 14, 1968, then tried on the third charge *after* the federal case in which Mr. Louisell was defense counsel was completed. Under the agreement, the trial in the federal court was to begin on Monday, November 18, 1968. Mr. Louisell gave his assent to the agreement on November 7, 1968. According to the trial judge, Mr. Louisell assured the court that his tests would be completed, and that he would be prepared to try the blackjack case on November 14.

Mr. Louisell practices in the firm of Louisell and Barris, with two other lawyers. Mr. Ivan E. Barris, his partner, and Mr. Neil H. Fink, his associate, collaborated, according to the undisputed findings of the trial court, on all the cases in which the Appellant was involved. Mr. Fink and Mr. Barris shared the responsibilities of examination of witnesses and arguing to the jury with Mr. Louisell. According to the trial court, the three worked as a team. As for the ability of the three lawyers, the trial court stated:

"The three lawyers are indeed remarkable men. All three are excellent advocates. Each is an outstanding craftsman of the law. Each is gifted in establishing and maintaining rapport with juries. Each is talented in eliciting direct testimony. Each is brilliant in cross-examination. Each is superb in arguing to juries. Each is a master in arguing law to judges. Each is capable of giving the defendant an outstanding defense."

From the record, it is undisputed that all three lawyers were familiar with, and prepared to try, the blackjack case on November 14, 1968.

On Tuesday, November 12, 1968, Mr. Fink informed the trial judge that Mr. Louisell's tests would last longer than they had previously anticipated, and that Mr. Louisell would not be available for trial on Thursday, November 14, 1968, when the blackjack case was scheduled. Mr. Fink requested a continuance in order that Mr. Louisell be able to remain in the hospital and still try the case. When asked how long a continuance would be necessary, Mr. Fink was unable to say. No medical certificate or affidavit was presented to the trial court. The trial judge spoke on more than one occasion with Mr. Louisell's doctor in Ann Arbor, and was informed that Mr. Louisell's life was not in danger, but that it was recommended that he remain in the hospital to complete the tests. Mr. Fink reminded the trial court that although the federal case had been

scheduled for November 18, the district court had expressed a willingness to begin the trial a few days later, if necessary; and he stated that the blackjack case would not take more than a day to try. Nevertheless, the trial court denied the continuance, compelling the Appellant to trial with Messrs. Barris and Fink as his attorneys. The Appellant did make oral protests that he wanted Mr. Louisell as his counsel, but, when informed of the denial of the continuance, made no objection whatsoever to being represented by Messrs. Barris and Fink, and made no attempt to obtain other counsel.

The Appellant was tried and convicted. There is no contention that Messrs. Barris and Fink did not perform well, or that the Appellant's trial itself was anything other than a model of fairness.

Nevertheless, the Appellant continued to object to the denial of the continuance. On November 29, 1968, he filed a motion for a new trial, reciting the denial of a continuance as one of the grounds. No affidavit was filed and no sworn testimony was proffered regarding Mr. Louisell's unavailability, or regarding any danger to Mr. Louisell's life or health if he had appeared for the trial of the blackjack case. On December 6, 1968, an oral argument was made on the motion. During the oral argument, neither affidavits nor sworn testimony was proffered, nor did the Appellant move orally or in writing to supplement the record, even when told he could do so. On December 9, 1968, a supplemental motion for new trial was filed, and four days later a hearing took place. Neither in the motion nor at the hearing was there any sworn testimony proffered or presented.

Only on January 31, 1969, did the Appellant file a "Motion For Order Granting Evidentiary Hearing," in which he requested an evidentiary hearing and proffered testimony regarding Mr. Louisell's unavailability. The trial court held that the time for such a motion had had expired, and denied it. [The trial court's opinion denying said motion is attached as "Appendix A".]

The Appellant cites United States v. Johnston, 318 F.2d 288 (6th Cir. 1963) as precedent in his argument that the trial judge in the instant case abused his discretion in refusing the continuance. In *Johnston*, the defendant was charged with mail fraud and wire fraud, and with conspiracy to commit each offense. He was also represented by Mr. Louisell who, on the date of trial, appeared in court with Mr. Barris, and informed the court that because of an "imperative commitment" to argue a case before the Supreme Court of Michigan, he would be unable to try the defendant's case. He informed the court, however, that Mr. Barris had collaborated with him in every case he had handled for eight years, and that since Mr. Barris had participated in the pre-trial phase of the case and was conversant with the indictment, he would be able to try the case in Mr. Louisell's stead. The defendant objected to this arrangement, said he had confidence in Mr. Louisell but did not know Mr. Barris, and requested time to retain a lawyer he had confidence in. The District Court denied the request, forcing the defendant to go to trial with Mr. Barris. Our Court reversed, holding that the District Court erred in not allowing the defendant a fair opportunity and reasonable time to employ counsel of his own choosing.

The *Johnston* case is distinguishable in several critical respects from the instant case. First, the defendant had made vigorous efforts to obtain another lawyer after Mr. Louisell abandoned him. His efforts were in vain. In the instant case, the Appellant made no attempt to retain another lawyer. Second, in the *Johnston* case, the trial court had no reason to believe the delay would be a long one; whereas, in the instant case, the Appellant's request was virtually open-ended. The court was given no assurance that Mr. Louisell would be prepared to try the blackjack case before the federal case began, and, if he was

not, the delay could have been as much as one-third of a year. In the *Johnston* case, the defendant stated he had no confidence in Mr. Barris. In the instant case, the Appellant stated he preferred Mr. Louisell, but made no objection to the representation of Messrs. Barris and Fink. *Johnston* does not indicate whether the defendant had asked for or received prior continuances. In the instant case, the Appellant had had two. In *Johnston,* the reasons why counsel would be unavailable were stated in open court. In the instant case, no documentation was ever made of the reasons why Mr. Louisell would be unable to attend.

"The matter of continuance is traditionally within the discretion of the trial judge. * * * There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, *particularly in the reasons presented to the trial judge at the time the request is denied.*" Ungar v. Sarafite, *supra,* 376 U.S. at 589, 84 S.Ct. at 849 (emphasis added.)

Mr. Louisell's failure to provide the appropriate documentation at the time the request was made evidenced, at least, a cavalier disregard for the process of the court and the rights of his client. We need not consider the trial court's finding that it was part of a concerted scheme to perpetrate a fraud upon the court and system of justice.

In summary, we do not believe the trial judge's denial of a continuance was an abuse of discretion for the following reasons: Mr. Louisell was in the hospital voluntarily, for a nonemergency checkup; associate counsel were available and prepared to try the case; the request for delay was open ended—it could have been four months or more before Mr. Louisell would again become available for trial of the case; the request for a continuance was not the first, but the third that had been made, all for the convenience of defense counsel; no competent proof was proffered showing how much notice the Appellant had that Mr. Louisell would be unavailable; no acceptable documentation of the reasons for the delay was proffered until over three months after the trial; the delay would work a very considerable inconvenience upon the court. In addition, we do not lose sight of the fact that the real issue here is whether Messrs. Barris and Fink properly and competently represented the Appellant. Williams v. United States, 332 F.2d 36, 39 (7th Cir. 1964), cert. denied, 379 U.S. 976, 85 S. Ct. 672, 13 L.Ed.2d 566. The trial judge, who witnessed the entire proceeding, and was in a favorable position to judge this aspect of the case stated:

"The instant blackjack case was tried for the defendant by Ivan Barris, assisted by Neil Fink. Mr. Barris is a member of the law firm Louisell and Barris. Mr. Fink is an associate, employed full time by the firm. Mr. Barris is a highly experienced and skillful trial lawyer. He is one of the outstanding members of the Michigan bar. If he is surpassed in ability by any trial lawyer, this observer has not met him. Neil Fink's experience is limited. However, he is licensed to practice and is a phenomenally gifted trial lawyer with skills which are astounding in view of his limited experience. Apart from the pretrial motions, in connection with which the defendant makes no claim of deprivation of counsel, the blackjack case was a simple one. Trial lasted only one day. The case was brilliantly and skillfully tried for the defendant by Barris and Fink. The defendant was more than adequately represented by them. For all his skill, Mr. Louisell could have done no better. The defendant was not prejudiced by Mr. Louisell's failure to appear."

The Appellant had a fair trial. Due process requires no more.

■ The Appellant's contention that the District Court erred in refusing to grant an evidentiary hearing on this is-

sue is without merit. 28 U.S.C. § 2254(d) (1964).

## II.

The Appellant contends that the blackjack which was introduced against him in his state prosecution was obtained as a result of a search conducted in violation of his Fourth and Fourteenth Amendment rights.

The following statement of the facts is derived from the record, the factual findings and the memorandum of the state trial court. That court's findings of fact on the issues of the lawfulness of Appellant's arrest and a search of his home were based upon a six-day hearing on a motion to suppress evidence. There is no indication that the "fact finding procedure employed by the state court was not adequate to afford a full and fair hearing" or that the Appellant "did not receive a full, fair and adequate hearing" with an opportunity to fully develop all of the "material facts." 28 U.S.C. § 2254, as amended in 1966. The Appellant was permitted to call any witnesses with relevant information and he was allowed broad latitude in cross-examination. The testimony brought forth at the hearing on the motion to suppress evidence fully reflected all of the relevant available evidence which Appellant's counsel chose to present.

Indeed, the only claim which Appellant lodges against any of the procedures used throughout the fact finding process is that the state trial court judge was prejudiced against him. As the District Court found after thoroughly reviewing the record, there is no merit in this vague claim. We conclude that the findings of fact made by the trial judge have been "reliably found." Under these circumstances, we must defer to his factual findings, which are "presumed to be correct." 28 U.S C. § 2254 (as amended, 1966); Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963).

On May 13, 1968, the Michigan State police secured a warrant for the arrest of the Appellant and thirteen other persons for conspiracy to commit extortion. The arrest warrant, which is stipulated to be valid on its face, was procured after a preliminary examination before a magistrate. The proofs before the magistrate established that the Michigan State police, the Chief Investigator of the Attorney General's office and Detroit police had been carrying on an investigation of an alleged conspiracy to extort and that there was probable cause to believe that the Appellant was a participant in this conspiracy.

After a conference at the Federal Building in Detroit, a task force consisting of four agents of the Federal Internal Revenue Service, two Sterling Heights police officers, two Detroit police officers and one State police officer, Sergeant Mull, who was in charge of the task force, appeared at Appellant's residence at 6:00 a. m. on May 14, 1968. The size of the arresting party may be explained in part by the fact that on a prior occasion an officer was assaulted while lawfully in the environs of the Appellant's home. The composition of the arresting party, including members of the Intelligence Division of the Internal Revenue Service, suggests that contemporaneous with the lawful arrest of the Appellant, it was the intention of some of the arresting officers to conduct a search for evidence incident to the arrest of Appellant. The scope of their intended search and their intentions with regard to the arrest are not relevant to the instant case because the blackjack which was seized was not discovered as a result of any general exploratory search, as will be shown later.

The Appellant met Sergeant Mull and four arresting officers at the front door. The other officers had surrounded the house to prevent escape. One officer saw an unidentified person quickly open and close the back door before the Appellant opened the front door of his house. When he answered the door, Appellant was clothed in a pair of "shorty pajamas," bedroom slippers and a robe, and a prosthesis was attached to his leg.

In the front foyer of the house, just inside the door, Sergeant Mull announced to the Appellant that he was under arrest for conspiracy to extort, quickly searched the person of Appellant and started to read the arrest warrant.

The Appellant announced he was ready to go. Sergeant Mull responded, "Well, can we go into another room, where I want to read the rest of this material [arrest warrant and *Miranda* warning] to you" and words to the effect "Well, you don't want to go [before a magistrate in court] like that, and the way you're dressed, in shorty pajamas and a robe." Sergeant Mull then walked with the Appellant from the front foyer into the dining room where the light was better for reading. Sergeant Mull completed the reading of the arrest warrant and gave Appellant a *Miranda* warning. Thereafter, Appellant read the arrest warrant to himself and stated he was "ready to go."

In response, Sergeant Mull suggested that it would be well for the Appellant to change from bed clothes to street clothes before leaving for the station and for his arraignment on the warrant before the Grosse Point Municipal Court. In the words of the trial court, "Vito Giacalone willingly accepted the suggestion." In reference to the possible coercive effect of Sergeant Mull's suggestion, the trial court found as follows:

"Vito Giacalone was dressed in short pajamas and a robe. He had a prosthesis on his right leg. He was about to go to a court of law. The Court finds that Mull's suggestion that Vito Giacalone change from bed clothes to street clothes was perfectly reasonable and proper; that it was a suggestion, not a directive or an order; that Vito Giacalone readily accepted it without any sense of duress or compulsion; that Mull's suggestion was made in good faith, without hidden or ulterior motive; and finally that Mull's suggestion about the defendant's attire was made without the

intention or purpose of enabling the police to search the bedroom or any other area. This finding is corroborated by the fact that the officers upon entering the defendant's bedroom did not immediately begin to search it, as will be seen.

Immediately after this exchange, the Appellant, Sergeant Mull and three or four officers went up the stairway and into the Appellant's bedroom so he could get dressed. Upon entering the bedroom, the trial court found that

By word, gesture and overt act, the defendant [Appellant] showed that he wanted and intended to get clothes out of a chest of drawers in his bedroom. It was only after the defendant manifested such intention that Lieutenant Oakes said, 'Wait a minute,' in order to search the chest of drawers for possible weapon. He searched the drawers in the chest. Immediately he found a small arsenal. In the top drawer he found a blackjack or slapjack and two .38 caliber six-shot revolvers, both loaded. In another drawer of the chest he found a third .38 caliber six-shot revolver. He found a fourth .38 caliber five-shot revolver in the same chest of drawers, and also in that chest of drawers a single-shot Derringer. Five handguns altogether were taken from the chest of drawers, at least two of which were loaded and ready to be fired.

◼ The course of events from the arrival of the arresting party, the arrest by Sergeant Mull, the reading of the warrant, the giving of the *Miranda* warnings, the conversation about the appearance of Appellant in bed clothes before a court, and the repairing of the Appellant to his bedroom, where the blackjack was discovered in a drawer into which the Appellant was about to reach—all of these events form one single continuous flow of action which was the natural consequence of the arrest at 6:30 a. m. of a person at his home and in his bed clothes.

It is significant to note that the conversation of Appellant and Sergeant Mull and the ensuing search which resulted in the discovery of the blackjack were largely unrelated to the more widespread search for evidence being conducted by certain of the members of the arresting party at, during and after the arrest.

Based on these facts the District Court denied Appellant's petition for habeas corpus. In so doing, the District Court held that Appellant's arrest was made in good faith and upon probable cause and not used as a subterfuge or pretext to make an otherwise impermissible search, Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); United States v. James, 378 F. 2d 88 (6th Cir. 1967); and further, it held that the search which uncovered the blackjack was a reasonable search incident to Appellant's arrest, and that—insofar as the discovery of the blackjack was concerned—the search was not that of a general exploratory expedition. We agree.

We do not dispute Appellant's contention that an arrest may not be used as a mere subterfuge by law enforcement to gain otherwise impermissible access to a person's house, papers and possessions. Jones v. United States, *supra*; United States v. James, *supra*. In both *Jones* and *James*, the primary purpose of the arresting law enforcement officials was in making a warrantless, general exploratory search of the arrestee's possessions. And in both *Jones* and *James*, the arresting law enforcement officials were not engaging in a "good faith" arrest of the accused. As the United States Supreme Court stated in Jones v. United States:

"The testimony of the federal officers makes clear beyond dispute that their purpose in entering was to search [the premises] * * * not to arrest petitioner."

The rationale of the *Jones* and *James* cases is inapplicable to the instant case. The facts produced at the hearings in the trial court unquestionably support the conclusion that the arrest of the Appellant was based on probable cause, was in "good faith," and was not used as a mere pretext to engage in an otherwise unlawful warrantless search. The extensive investigation of law enforcement officials prior to the arrest, the evidence adduced by state police to a magistrate before the arrest warrant issued, and the diligent attempts by Michigan law enforcement officials to convict the Appellant on the charge for which he was arrested are ample evidence that the arrest of Appellant was not a mere subterfuge to justify an incidental search.

 It is true, of course, that contemporaneous with the lawful arrest of the Appellant it was the intent of at least some of the law enforcement officers involved to engage in a rather general search of Appellant's house after Appellant had been arrested and their safety had been assured. The desire of an arresting officer to initiate a search incident to a lawful "good faith" arrest does not convert that lawful arrest into an unlawful subterfuge to conduct an impermissible search. In arrests prior to Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which is not to be applied retroactively, *see,* Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), it was not unusual for arresting police to have an intent contemporaneous with a lawful arrest to search the arrestee's home, possessions, and papers for evidence of the purported crime or related crimes of the arrestee. Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L. Ed.2d 484 (1971); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Applying the principles of *Hill, Rabinowitz,* and *Harris*— each of which involves thorough searches of an entire office or apartment—we may conclude that prior to Chimel v. California, *supra,* a search did not become unlawful because contemporaneous with a good faith arrest based upon

probable cause, the arresting officer also intended to search for evidence of the arrestee's alleged crimes. *See* Williams v. United States, *supra.*

The Appellant also contends that even if his arrest was lawful, that the ensuing search which revealed the blackjack was an unreasonable general exploratory search. We do not agree.

We need not concern ourselves with the activities of each of the officers in the arresting party. The only evidence sought to be introduced in this case is the blackjack discovered by law enforcement authorities after the Appellant had been arrested and informed of his rights and as by word, gesture, and overt act, the Appellant manifested an intention of reaching into a drawer in his bedroom bureau which contained the blackjack and other lethal weapons. There is sufficient evidence to support the determination of every court which has reviewed the evidence that Appellant's decision to walk from the dining room to his bedroom in order to change into more appropriate clothing was voluntary and consensual. Certainly, if immediately after a lawful arrest, the arrestee reads the arrest warrant and without coercion consents to go to his bedroom to change into more appropriate clothing, the arresting officers—incident to that arrest—may search the areas upon which the arrestee focuses his attention and are within his reach to gain access to a weapon or to destroy evidence.

The principle that law enforcement officials to protect their own safety may search the area within the immediate control of a person whom they have arrested has never been seriously challenged. *See* Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1967); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). And in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the United States Supreme Court affirmed the continuing validity of this principle when it observed:

"A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 395 U.S. at 763, 89 S.Ct. at 2040.

Applying these principles, the arrest of Appellant was lawful and the decision of the Appellant to enter his bedroom was reasonably close to the time and place of arrest and pursuant to a reasonable lawful purpose of changing out of one's bed clothes before leaving. The discovery of the blackjack in the bedroom was the result of a search directed by the arresting officer of the area within the intended reach of the arrestee. Under such circumstances, the discovery of the blackjack was reasonably incident to the Appellant's arrest.

It was not necessary to explore the lawfulness of the search as it relates to any other items which were seized, nor is it necessary to speculate on the lawfulness of the search had the arrestee been compelled to enter his bedroom at the direction of law enforcement officials.

We have considered the remaining issues raised by Appellant and find them without merit.

The decision of the District Court denying Appellant's petition for habeas corpus is hereby affirmed.

## APPENDIX A

### OPINION ON MOTION FOR EVIDENTIARY HEARING

(Circuit Court—County of Wayne)

(Filed February 11, 1969)

(People v. Vito Giacalone)

On or about November 7, 1968, a short continuance of the blackjack trial

was granted until November 14 to enable Mr. Louisell to enter the hospital for diagnostic tests on his assurance that he would be present for trial on the adjourned date.

On the morning of November 12, defense counsel made an oral motion to continue the blackjack trial indefinitely until Mr. Louisell would be available to try the case. In support of the motion it was alleged orally that Mr. Louisell could not leave the hospital. No affidavit or sworn testimony accompanied this motion. The motion was denied.

Later in the day, on November 12, defense counsel made an oral motion for rescission of the change of venue. The principal ground was that Mr. Louisell would not be available to try the case and Mr. Fink was uneasy about empathy between himself and a St. Joseph County jury. There was no affidavit or sworn testimony submitted regarding Mr. Louisell's unavailability. The motion for rescission of the change of venue was denied.

On November 14, defense counsel made it clear that the Court was proceeding to trial contrary to the defendant's preference that Mr. Louisell should be present as defense counsel. This was a renewal of the position earlier taken by the defendant on November 12. On November 14 again it was made to appear by defense counsel that Mr. Louisell was confined to the hospital, and there was in effect another request for a continuance on this ground, among others. This was likewise an oral request. Like the prior oral request for adjournment, this request was unaccompanied by supporting affidavit or sworn testimony regarding Mr. Louisell's unavailability. On November 14, Ivan Barris, one of the defendant's attorneys, sought to reserve the right to supplement the record. The remarks of the Court clearly encouraged the filing of a motion to supplement the record. However, no such motion to supplement accompanied the next pleading or court appearance.

On November 15, 1968, there was a post conviction hearing on bond. No sworn evidence was presented or offered regarding Mr. Louisell's hospitalization, nor was there any motion, written or oral, to supplement the record in connection with Mr. Louisell's hospitalization.

On or about November 29, 1968, a written motion for new trial was filed. In this motion, one of the grounds urged by defendant was that he was unconstitutionally deprived of the right to counsel and unconstitutionally denied due process of law in that he was forced to trial while counsel of his choice was unavailable. No affidavit was filed and no sworn testimony was proffered regarding Mr. Louisell's unavailability in support of the motion for new trial. Nor was the motion for new trial accompanied by a motion to supplement the record regarding Mr. Louisell's hospitalization.

On December 5, the defendant was sentenced. At the sentencing hearing, no affidavits regarding Mr. Louisell's hospitalization were filed and no proofs on this subject were presented or proffered, nor was a motion filed, either orally or in writing, requesting a supplementation of the record respecting Mr. Louisell's hospitalization.

On December 6, oral argument was heard on the motion for new trial. In the course of oral argument, neither affidavits nor sworn testimony were presented or proffered concerning Mr. Louisell's hospitalization. Nor did the defendant orally or in writing move for an opportunity to supplement the record in this regard. Indeed, Mr. Louisell said

"* * * on reading the transcript of the proceedings at Centreville, I notice that you told Mr. Barris that Mr. Barris might, or I might, be accorded an opportunity to supplement the record with respect to my hospitalization.

"I don't think at this posture that it is a matter with which we are germanely concerned on the motion for new trial."

Thereafter Mr. Louisell went on to make certain unsworn pronouncements con-

cerning his hospitalization which tended to confirm this Court's belief that his hospitalization was an elective, non-emergency visit for diagnostic tests for his own convenience, and not for the purpose of treating any disabling illness.

In the course of oral argument on the motion for new trial, the Court made it clear that evidence was lacking of Mr. Louisell's availability. The Court said,

"If a man wants to be excused from trial because of illness, he ought to present some solid testimony, or an affidavit at least."

To Mr. Louisell's unsworn argument that he remained in the hospital beyond November 14 on the insistence of four physicians, the Court replied,

"Well, that may have been your choice. There was no court order keeping you in that hospital."

The Court's skepticism is further demonstrated in the following reply to Mr. Louisell's argument that he had an obligation to his family, to his children, as well as to the Court:

"The Court: That obligation didn't keep you from being out actively practicing law on the 18th day of November."

Further the Court said:

"Well, as I see it, you did not make any adequate predicate for a continuance. * * * As I see it, you were expected to try a case on behalf of your client on November 14, and for your own convenience did not."

Despite the clear manifestation by the Court on December 6 that Mr. Louisell's incapacity was not established to the Court's satisfaction, at the next opportune moment no affidavits were filed and no sworn testimony presented or proffered regarding Mr. Louisell's hospitalization.

The next opportune moment came on or about December 9, 1968, when a supplement to the motion for a new trial was filed. No affidavit concerning Mr. Louisell's hospitalization accompanied the supplement to the motion for new trial. Nor was there any sworn testimony presented or proffered at the hearing upon the supplement to the motion for a new trial which took place on December 13, 1968.

Only after long and arduous toil by the Court in research, in studying authorities, in arriving at a decision on the motion for a new trial, and in reducing the decision to writing, did the defendant seek to supplement the record concerning Mr. Louisell's hospitalization. One can only conclude that the defendant and defense counsel speculated upon the outcome of the motion for a new trial, and only after it was adversely decided did they seek an evidentiary hearing respecting Mr. Louisell's hospitalization.

General Court Rule 503 deals with continuances. Subsection 1 is as follows:

"1 Policy. It is the policy of this rule to encourage the diligent preparation and trial of cases. Continuance for any cause shall not be granted unless a showing is made and the court finds that the grounds for continuance do not arise out of the fault or negligence of the moving party and the court finds that substantial justice more nearly will be obtained."

The local Wayne Circuit Court rule applicable to postponements in criminal cases provides:

"No trial of a criminal case shall be adjourned except by the Presiding Judge for good cause shown upon written motion of the party seeking the adjournment."

Neither the spirit nor the letter of these rules was complied with by the defendant. A "showing" of "grounds" for continuance was not made as required under Rule 503, nor was a timely motion in writing filed before the Presiding Judge as required by Rule 31, Part B, Subparagraph 9 of the local court rule.

Apart from these rules, and even if we regard them as directory rather than mandatory, this motion for evidentiary hearing comes too late.

The proper time for proof of Mr. Louisell's disability was on November 12 when the motion for continuance was first made. Perhaps such proofs would not have been too late if offered when court opened in Centreville on the 14th day of November. Such proofs were not proffered nor the point preserved in the hearing on bond on November 15. Such proofs were not proffered nor was the point preserved at the time of the sentence hearing. Certainly such proofs should have been proffered not later than the date of filing of the motion for new trial on November 29. Extending great charity to the defendant, perhaps it would not have been an abuse of the trial judge's discretion to have considered sworn proofs if proffered by December 6, December 9, or December 13. The last date is the date of oral argument on the supplement to the motion for new trial. It is the date on which motion for new trial was submitted to the Court for disposition.

Up to this very moment, there has been no showing that in the exercise of reasonable diligence, sworn proof could not have been offered on or before the trial on November 14. A fortiori there has been no showing that sworn proof could not, in the exercise of reasonable diligence, have been submitted in connection with the motion for new trial and supplement thereto.

"To everything there is a season, and a time to every purpose under the heaven." [1] On November 12, the timely moment for a showing under oath, the trees were not yet altogether barren of autumn leaves. The leaves have long since gone. Indeed, the first snows had fallen by the time the motion for new trial was filed. The winter solstice has come and gone. Only now we are told, after a decision adverse to the defendant on a motion for new trial, that an evidentiary hearing is sought to supplement the record regarding Mr. Louisell's hospitalization. And parenthetically,

still there are no physician's affidavits accompanying this motion.

If a modicum of order is to be preserved in the proceedings of trial courts, points must be urged with evidence in support at the relevant timely moment. The time for evidentiary support of the oral petition for continuance was before trial. The time for evidentiary support of the assertion of the right to chosen counsel was likewise before trial. Or if this could not be done in the exercise of reasonable diligence, the time for sworn support of the request for continuance and the time for sworn support of assertion of the right to chosen counsel was as soon after trial as reasonable diligence permitted. Now a jury trial has been completed. Much human effort, much expense, much inconvenience, much tribulation attended that trial. There followed two post conviction hearings, and after such hearings there followed a motion for new trial, filed and argued in two steps. At none of these stages in the proceedings were sworn proofs presented or tendered. At none of these acts in the drama was there an oral or written application for an opportunity to supplement the record regarding Mr. Louisell's hospitalization.

Much human effort and anguish of decision attended the disposition of the motion for new trial. True, the decision on motion for new trial considered the possibility of genuine physical incapacity or disability on the part of lead counsel and held that even such disability would not warrant the continuance sought (since the delay sought was unreasonably long and uncertain in duration). However, the disposition of the motion unquestionably relied heavily on the absence of competent evidence of disability. At the very latest, such evidence should have been submitted before the motion for new trial was placed in the Court's hands for decision, particularly in view of the skepticism expressed by the Court during oral argument of the motion on December 6.

1. Ecclesiastes, Ch. 3, v. 2.

There is such a thing in the law as simply being too late. The instant motion is just that. If courts do not require timely presentation of issues, our system of criminal justice will be beset with delay, disorder, and disarray. If courts do not require timely presentation of issues, wasted time and effort will be built into the administration of criminal justice, along with one more loophole for loophole-seekers.

There is a season for everything, and everything in season. The season for a motion such as this one is long since past. In season, this judicial drama has had a tremendous amount of time and attention. The Court must in fairness to other litigants be heedful of other cases, about 1300 in number, which are this Court's individual responsibility. The motion for continuance must be tested by the showing which accompanied the motion. The motion for new trial must be tested by the showing which accompanied that motion. It would be a misallocation of judicial time to hear stale evidence which can no longer properly affect the Court's judgment. To do this, with approximately 1300 other cases awaiting hearing, some for over three years, would be most unfair to other litigants. Vito Giacalone has had more than his fair share of judicial attention. It is time for the trial court curtain to drop on this judicial drama. It is time for the Court's attention to be directed to other litigation. For these reasons the motion is denied.

Dated this 11th day of February, 1969.

Victor J. Baum<br>Circuit Judge

McCREE, Circuit Judge (dissenting).

I do not believe the majority correctly states the law applicable to either issue.

To determine whether the trial court abused its discretion in denying appellant a continuance, the majority would balance appellant's "right to adequate representation of counsel at trial, and the public interest in the prompt and efficient administration of justice." This approach is inconsistent with our decision in United States v. Johnston, 318 F.2d 288 (6th Cir.1963), in which we held that the Sixth Amendment requires that a defendant who is informed shortly before trial that counsel of his choice will not be available to represent him, must be afforded a "fair opportunity and reasonable time to employ counsel of his own choosing." Id. at 291. We held that a period from Friday to the following Tuesday, the day of trial, "was not a reasonably sufficient time to give appellant fair opportunity to select and employ counsel of his own choosing," and we also stated: "[a]ctually it seems to us that appellant was not prejudiced by the action of the District Judge in this respect but this situation does not satisfy appellant['s] rights under the Sixth Amendment [citations omitted]." Id. at 291.

The majority's attempts to distinguish Johnston are unconvincing. It is argued that Balk (the successful appellant in Johnston) personally asserted his desire to obtain an attorney other than his chosen attorney's associate; whereas, in this case the defendant personally did neither. However, this states a distinction which makes no substantial difference. It appears that appellant was not informed that his attorney would not be present at trial on November 14 until two or three days before that date. When so informed, he first attempted through Mr. Fink, Mr. Louisell's relatively inexperienced associate, to obtain a continuance until Louisell could be present, and that effort consumed an additional day until late in the afternoon on November 12. The task of obtaining substitute counsel willing to enter a criminal case on November 12 or 13 to be tried at 8:30 a.m. on November 14 in Centreville, Michigan, easily surpasses the difficulty faced by Mr. Balk in his case. It would seem unnecessary to require appellant to object to proceeding with Mr. Fink as his attorney, when

Fink himself stated to the court in appellant's presence:

> I find it much more favorable from my standpoint * * * to try the case in Wayne County.
>
> I don't know that I have any rapport with a nonurban jury * * *. [I]n fact, I have never been out of the city * * *. If I am going to represent a man on a 5-year felony charge, I want it to be a place where I'm used to and where I will feel most comfortable.
>
> * * * * * *
>
> Here you have, your Honor, a man stipulating on the record that he wants to stay in Wayne County, the place of his home vicinage. In any event, at the time the motion was made for a change of venue, it was contemplated then that Mr. Louisell would try the case. At this particular posture it has become obvious that I am going to try this case for Mr. Giacalone upon the Court's order. If I am asking to stay in Wayne County, Mr. Giacalone is asking to stay in Wayne County, why should we all go up to Centreville? * * *
>
> I don't feel competent to try a trial in Centreville and I mean that sincerely. I wouldn't know what questions to ask on voir dire.

The decision in *Johnston* does not turn upon Balk's unsuccessful attempt to obtain substitute counsel on short notice. In fact his chosen attorney was unavailable because he elected to use the day set for trial to prepare an argument to be presented to the Michigan Supreme Court. A continuance most likely would have resulted in the availability of Balk's original attorney of choice. That is what appellant sought here, but he was given neither that consideration nor a reasonable time to obtain acceptable alternative counsel.[1]

It is further asserted that the continuance sought would have been too long, perhaps four months, because of other foreseeable obstacles to Mr. Louisell's participation in this case. The first answer to this argument is that a four month delay to permit representation by an attorney of his choice does not seem inordinate when a man who had only one misdemeanor conviction was faced with the possibility of five years of imprisonment.

Second, the assertion that appellant had previously been granted two continuances is simply not supported by the record. On September 30, 1968, appellant admittedly requested an adjournment of the scheduled October 8 trial to October 21, in order to provide time for hearings and arguments on preliminary motions. However, during proceedings in the District Court, appellant asserted without contradiction that the case had been adjourned until October 21 pursuant to an October 4 request by the prosecution. The case was thereafter diligently pursued, and following disposition of preliminary motions, the trial date was set in consideration of counsel's long-standing appointment to enter a hospital on November 10 for sophisticated cardiovascular diagnostic tests.

Further, the trial judge was not limited to a choice between immediate trial or a four month delay. He might have delayed the trial a few days to permit appellant to obtain acceptable substitute counsel. Here, only 40 hours elapsed between the time when the court denied a continuance until trial, and most of this time was outside of normal business hours. This is less time than that held inadequate for securing other counsel in *Johnston*. Since it appears that the State's case was based entirely upon the testimony of police officers who searched appellant's home, the potential inconvenience to witnesses from delay in

---

1. On November 13, Mr. Ivan Barris, Mr. Louisell's partner, settled a case which had theretofore precluded his participation in the blackjack trial, and he appeared to represent appellant on November 14. At that time he asserted appellant's rejection of both himself and Mr. Fink as trial counsel.

this case was minor compared to that in *Johnston*. *Id.* at 290.

In stating that the real issue is whether appellant had competent counsel and was properly represented, the majority would overrule, *sub silentio*, our decision in *Johnston*. As authority for this decision, they cite Williams v. United States, 332 F.2d 36 (7th Cir. 1964), cert. denied, 379 U.S. 976, 85 S.Ct. 672, 13 L.Ed.2d 566 (1965). However, in that 2–1 decision, the dissenting judge pointed out that the majority rejected our *Johnston* rule. He stated, *id.* at 40, that

> [t]he denial of a continuance for his employed counsel was unfair [citation omitted], and this unfairness was aggravated by the court's forcing petitioner to trial without his employed counsel, instead of giving him further reasonable time to employ a substitute. United States v. Johnston, 318 F.2d 288 (6th Cir. 1963). This procedure was "fundamental unfairness" [citation omitted]. It is of no relevance that substitute counsel has not been shown to have been incompetent or inept. United States v. Johnston, 318 F.2d 288, 291 (6th Cir. 1963). \* \* \*

And even if it were appropriate to balance competing factors, I would not find the balance struck to be a fair one. It is difficult to imagine a case in which the witnesses would be more accessible to the prosecution, or more likely to remain so, than they were in this case.

I do not perceive the relevance of appellant's failure to offer sworn or written statements regarding Mr. Louisell's condition. Following at least two telephone conversations between the trial court and Mr. Louisell's doctors, it would seem that the situation was clear. After the initial tests, Louisell's doctors advised him to remain in the hospital a few days for additional tests. Although his life would not have been jeopardized had he failed to do so, the rescheduling of the tests at a busy medical center would have presented substantial difficulties. It therefore appeared advisable to complete the tests as the physicians advised.

The trial court listed ten reasons for his conclusion that Mr. Louisell's absence was a ruse to promote delay.[2] Six of those reasons (numbers 1–6) emphasized the irrelevant fact that appellant did not assert that Mr. Louisell was physically incapable of trying the case. Two other asserted reasons (numbers 7 and 8) merely express the trial judge's frustration and suspicion. The ninth asserted reason, appellant's failure

2. [1] In view of the elective, non-emergency, diagnostic nature of Mr. Louisell's hospitalization—

[2] In view of his positive assurances before the brief delay was granted that he would be out, fit and able to try the blackjack case, on November 14—

[3] In view of the extraordinary skill and vigor with which Mr. Louisell was trying cases as late as Friday, November 8, the last working day immediately before he was hospitalized—

[4] In view of the fact that he left the hospital on November 16—

[5] In view of the great talent and energy he displayed in the trial of cases as early as November 18, soon after he left the hospital, indeed, on the second working day after the completion of the blackjack trial—

[6] In view of the absence of any sworn evidence of his disability to try the blackjack case—

[7] In view of the Court's insistence that Mr. Louisell guarantee his presence at trial as a condition for the short adjournment between gun and blackjack trials—

[8] In view of the convenient excuse for a long delay presented by Mr. Louisell's hospitalization and the marathon Rubino trial, if only the trial of the blackjack case could be avoided for a few days—

[9] In view of Mr. Giacalone's failure to seek counsel other than those in the office of Louisell and Barris—

[10] In view of the absence of sworn testimony showing the time the defendant first became aware that Mr. Louisell would not try the blackjack case—

[order and numbering supplied].

to seek substitute counsel, has been considered above. Finally, the court referred to appellant's failure to state under oath the time when he was first informed that Mr. Louisell would not be available for trial. This last factor is the only one material to the propriety of denying a continuance, but it does not appear that appellant's prior knowledge of the scheduled tests was the subject of discussion at the time the court reached its decision. Instead, the focus was upon the status of the tests and the judgments of Mr. Louisell's doctors. In this regard, after a telephone conversation involving the court, one of Mr. Louisell's doctors, Mr. Fink, and state counsel, the following colloquy occurred:

Mr. Goussy: * * * the doctor saying after he came into the hospital, that he wished to keep Mr. Louisell further because of some tests that they wished to run on something that had shown up.

The Court: Mr. Fink wants to supplement the record by stating that the doctor took issue with the statement by me on the telephone that Mr. Louisell's entry was elective.

Mr. Goussy: I don't recall him taking issue with that, no.

The Court: Well, I don't think he took issue, but I think he rather quickly described the circumstances, indicating that he, the doctor, wanted Mr. Louisell in at that time.

Mr. Fink: I think that's a fair statement. I also just wanted to supplement it to this extent, that any plan to keep Mr. Louisell past the 13th was only arrived at after Mr. Louisell's entry into the hospital; and when the doctor indicated—at least, I got the inference that he had found something that had, well, worried him or opened his mind to thinking along another direction, and that he wanted to pursue that.

Since it appears that the decision to keep Mr. Louisell beyond November 13 was made after he entered the hospital on November 10, the implication of an earlier plot by appellant and his counsel was gratuitous.[3] The physicians' judgments that further tests were indicated should be enough to excuse the attorney. We should not announce a rule which requires a showing that life is endangered before counsel may obtain a continuance for medical reasons. I do not understand the trial judge to have found that a conspiracy existed between Mr. Loui-

3. I observe that the trial judge was of the opinion that appellant was a major figure in organized crime. In an opinion denying bail pending appeal the court stated:

Second, based on the investigation of the probation department and the testimony given under oath before the United States Senate Subcommittee on Investigations of the 88th Congress (testimony which, I might add, was given by honest, knowledgeable men who testified subject to the penalty of perjury) I am satisfied that Vito Giacalone is, and for virtually all of his adult life has been a participant in a large-scale organized criminal conspiracy.

In reversing the refusal to allow bail pending appeal, the Michigan Court of Appeals stated:

The moving papers state without contradiction that the defendant is 46 years of age, married and has 7 children ranging up to the age of 18 years, has a large home and has roots deeply imbedded in the community. While the defendant has frequently been arrested, his only prior conviction was in 1960 for a misdemeanor for which he was sentenced to 90 days in the Detroit House of Correction and a $300 fine.

There being substantiality to the appeal, we should not deny bond unless we are convinced that bail should be denied because of the danger of flight, potential of harm to the community or risk to the proper administration of justice.

* * * * *

The crime of which defendant has been convicted is not an assaultive crime. The blackjack was not found on his person but in a dresser drawer in his bedroom. The defendant has no record of conviction for commission of assaultive crime. His reputation as an evil doer is not a relevant consideration. People v. Giacalone, 16 Mich. App. 352, 360–361, 167 N.W.2d 871, 876 (1969).

sell and his doctors, who were specialists of international repute serving on the staff of University Hospital in Ann Arbor, Michigan, a teaching facility of the University of Michigan.

I proceed to the second issue, since granting the writ because of the denial of the opportunity to be represented by counsel of appellant's choice would presumably result in a new trial and would leave unanswered the serious question of the validity of the search which revealed the blackjack. I conclude that the search was illegal for two reasons. First, the primary purpose of the arresting officers was to make a general exploratory search of appellant's home, and second, the search was too extensive to be upheld as incident to the arrest.

The majority opinion adopts the conclusion of the trial judge who found that "the weapons * * * were seized quite early in the law enforcement enterprise as the direct product of a lawful good faith arrest and limited search, incident thereto." This determination is supportable only by segmenting this "law enforcement enterprise" into discrete episodes—an approach which is without support in law and distorts reality.[4] This technique makes it appear that the arrest occurred in or near appellant's bedroom and that the search of the dresser drawer where the blackjack was found was simply an incident thereof. It strips of legal significance the undisputed events which preceded and followed this discovery.

The conclusion that appellant, without coercion, proceeded from the front foyer where he first admitted the officers to the upstairs bedroom where the inculpating discovery occurred illustrates the distortion which occurs from viewing the several incidents of that morning as isolated events. Without prologue, no one would impute anything but innocence to a suggestion that a man in sleepwear should put on outdoor clothing before going to the police station. However, that is not what happened here.

As the trial court found, appellant, in response to a command from Sergeant Mull, promptly answered the front door and admitted the officers. Sergeant Mull, carrying a sawed-off shotgun, and

4. The cases relied on by the trial court do not support this approach: In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court held that an unsigned confession admitted against Wong Sun was not the "fruit" of his illegal arrest and was hence admissible; and that the illegal seizure of heroin admitted into evidence against him "invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial." *Id.* at 492, 83 S.Ct. at 419. The heroin had been seized as a result of the illegal arrest of one of Wong Sun's codefendants and this issue turned on lack of standing.

In Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Court reversed the affirmance of appellant's conviction, by the Court of Appeals, and remanded the case to the District Court for further proceedings, theretofore erroneously denied by the District Court, to determine whether evidence used against him was the "fruit" of messages intercepted by the government in violation of the Communications Act of 1934, 47 U.S.C. § 605.

In Agnello v. United States, 269 U.S. 20, 31, 46 S.Ct. 4, 70 L.Ed. 145 (1925), the Court sustained the searches of Agnello and his codefendants, who were arrested immediately after government agents had witnessed an illegal sale of narcotics, and the seizure of narcotics either revealed by those searches or in plain view at the scene of the arrest. However, the Court held illegal the subsequent search of Agnello's house several blocks from the scene of the arrest.

In Vanella v. United States, 371 F.2d 50 (9th Cir. 1966), cert. denied, 386 U.S. 920, 87 S.Ct. 883, 17 L.Ed.2d 790 (1967), the court sustained a search of Vanella's residence incident to his arrest upon a warrant for conspiracy to violate narcotics laws, but held illegal the search prior to arrest of a person found in Vanella's home.

In Hayden v. Warden, 363 F.2d 647 (4th Cir. 1966), rev'd, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the court held that evidence of only "evidential value" had been illegally seized at the time of Hayden's arrest despite the fact that the search which revealed the evidence was itself illegal.

several other officers walked into the house. Mull informed appellant, who was wearing "shorty pajamas" and a robe, that he was under arrest for conspiracy to extort and quickly searched him. This took place in the front foyer of the house.

Before Mull had finished reading the warrant, Giacalone announced that he was ready to leave. Meanwhile, as some indication of the real purpose of the expedition, other officers, instead of limiting their search to the foyer, fanned out through the first floor and basement, ostensibly making "a quick eye inspection for persons who might hinder the arrest or assist the defendant to escape." There appears no motivation for appellant to have announced his readiness to go in his robe as he stood in the front foyer other than his desire to limit the officers' intrusion into the privacy of his home which they had no warrant to search. Nevertheless, Sergeant Mull moved into the dining room "where the light was better for reading * * * the warrant" and advised defendant of his *Miranda* rights.

Upon completion of the reading of the warrant, appellant again announced that he was prepared to go to the station. Again Sergeant Mull deferred their departure and suggested that appellant change to street clothes. Appellant contended that Sergeant Mull ordered him to change clothes and that Mull had already stated that there was to be a search of appellant's bedroom. One of the arresting officers also testified that Mull announced then that he intended to conduct a search. Nevertheless, the trial court found that Mull's suggestion was "* * * not a directive or an order; that Vito Giacalone readily accepted it without any sense of duress or compulsion; [and] that Mull's suggestion was made in good faith, without hidden or ulterior motive * * *." [5]

The conclusion that appellant accepted the suggestion voluntarily is unsupportable, and it should be rejected. It is inconsistent with appellant's two previous announcements that he was prepared to leave. As the Supreme Court stated in Townsend v. Sain, 372 U.S. 293, 316, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963):

This Court has consistently held that state factual determinations not fairly supported by the record cannot be conclusive of federal rights. [Citations omitted]. Where the fundamental liberties of the person are claimed to have been infringed, we carefully scrutinize the state-court record. [Citations omitted].

5. I observe that Sergeant Mull's testimony on cross-examination was demonstrably inaccurate in some respects:

Q Well, in any event you have acknowledged that you made one call, phone call to Lieutenant Schwartzendruber?

A Yes, sir.

Q And you told Lieutenant Schwartzendruber did you not, "We can't bring him in yet because we're not through with the search"?

A No, sir.

Q You say you didn't?

A That's right.

Q Do you remember—so we don't have any misunderstanding Mr. Mull, I am asking you if it is not a fact that you told Lieutenant Schwartzendruber when you called him that you couldn't bring him in yet because you hadn't completed the search?

A Not that I recall.'

Q Do you remember being asked this question and your giving this answer, page 62 of the preliminary examination?

"Q You called him (referring to Schwartzendruber), to tell him that you were—you would be bringing Mr. Giacalone in?"

And the answer: "Yes."

Q That you hadn't completed the search?

And your answer: "Yes, sir."

* * * Is it your testimony then that you were searching the upstairs of the house not Mr. Giacalone's bedroom for weapons?

A And other persons.

Q And other persons?

A Yes.

Q Is that right?

A Yes, sir.

Q Well, first of all let's talk about the weapons. Page 75 of the preliminary examination.

"Q Now were you looking in these bedrooms for guns?

And the answer: No."

Also, acquiescence to the "suggestion" of a policeman armed with a sawed-off shotgun, wearing a sidearm and commanding a posse of eight officers can hardly be viewed as volitional. *See* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Bumper v. North Carolina, 391 U.S. 543, 550, 88 S. Ct. 1788, 20 L.Ed.2d 797 (1968). Under these circumstances, we can appropriately reach our own conclusion regarding the coerciveness of Mull's suggestion. As the Supreme Court stated in Brown v. Allen, 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (opinion of Mr. Justice Frankfurter speaking for a majority of the Court):

> Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts, [citation omitted] the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.

> For instance, the question whether established primary facts underlying a confession prove that the confession was coerced or voluntary cannot rest on the State decision. [Citations omitted].

*See* Townsend v. Sain, *supra*, 372 U.S. at 309 n. 6, 83 S.Ct. 745. *A fortiori* in this case, where the trial court's conclusions are predicated upon a legally erroneous piecemeal view of the activities of the seach party they should not be considered binding.

A segmented view of events and an unrealistic concept of consent would justify the search of virtually all of appellant's home. During the course of the search appellant was led into each of the three or four other upstairs bedrooms. He was then conducted to the kitchen, to the family room, and to the basement where he was required to open locked doors for the searchers. Several of the officers testified that appellant requested that he be allowed to accompany them on their search because he didn't want his house torn up. One officer recalled the statement as follows: " * * * Mr. Giacalone, if my memory is correct, said that, 'Go ahead and search, but don't tear the house up like you did the last time.'" There is no more tenable basis for considering the search of appellant's bedroom separately than there is for separately considering the search of each room in appellant's house.

My conclusion that the search was all one is further strengthened by the fact that the officers' primary purpose in arresting Giacalone was to conduct a search of his home. And the latter fact is itself enough to invalidate the search. United States v. James, 378 F.2d 88 (6th Cir.1967); United States v. Harris, 321 F.2d 739 (6th Cir.1963).

The trial judge characterized the activities of the Internal Revenue Service and Sterling Heights Police components of the arresting expedition as follows:

> Despite their uncontroverted protestations in the record to the contrary, I believe on the basis of circumstantial evidence that the IRS had some objective other than the mere reduction of Vito Giacalone to state police custody. Similarly contrary to the undisputed testimony of the Sterling Heights police officers, but on the basis of inferences arising from the evidence, I believe that they had some goal or purpose in addition to the mere arrest of Vito Giacalone on the extortion conspiracy warrant.

He also found that:

> * * * It had been agreed from the start that any tangible evidence would be turned over to Mull. * * * Mull was in charge throughout.

Events subsequent to the discovery of the blackjack further impugn the motives of the arresting officers. As the trial judge found:

> From information which the officer[s] had prior to this arrest, they were aware of a safe concealed under

the bedroom closet floor. They pulled up some loose floorboards to gain access. Upon the request of the officers, the defendant opened the safe. The officer inspected its content.

About an hour was spent in appellant's bedroom.

The search in the bedroom was followed by a thorough, systematic far-ranging search of the house which lasted about an hour more. Every room received at least a quick eye inspection. Certain rooms were gone over thoroughly and meticulously by expert searchers.

The officers testified that in their extensive search they were looking for concealed respondents named in 14-man warrant, for means and instrumentalites of the extortion conspiracy, for evidence of the conspiracy, and for offensive weapons. Regarding the quest which followed the bedroom investigation, the officers were rather hard put to describe any particular instrumentality or piece of evidence for which they were searching.

\* \* \* \* \* \*

As a part of the extensive search and investigation, about a dozen color photographs were made by Sergeant Mull in various rooms of the house. He also answered several telephone calls while search was being made \* \* \*.

\* \* \* \* \* \*

To be sure, in terms of numbers, the chief law enforcement agency in the arrest crew, with its four special agents, was the Internal Revenue Service of the United States. True also that upon the evidence in this record, IRS had nothing to do with the investigation of the extortion conspiracy. Admittedly, there were also two officers from the Sterling Heights Police Department in the arrest crew, although that Police Department was not directly concerned with the extortion conspiracy investigation. Further, it must be conceded that the most active searchers in the home

were from the Sterling Heights police force and the Internal Revenue Service.

It thus appears inescapable that the officers intended from the beginning to conduct and did conduct a general exploratory search. Although, as the trial judge found, the arrest warrant was obtained in good faith, the selection of the time and place of its execution and the manner of its execution make it abundantly clear that the search was the primary purpose of the officers' visit to appellant's home. See United States v. James, supra; United States v. Harris, supra.

But even if the primary purpose of the officers was not to conduct a search but to effect the arrest, the search exceeded constitutionally permissible bounds. As Judge Learned Hand stated in United States v. Kirschenblatt, 16 F. 2d 202, 203 (2d Cir.1926):

After arresting a man in his house, to rummage at will among his papers in search of whatever will convict him, appears to us to be indistinguishable from what might be done under a general warrant; indeed, the warrant would give more protection, for presumably it must be issued by a magistrate. True, by hypothesis the power would not exist, if the supposed offender were not found on the premises; but it is small consolation to know that one's papers are safe only so long as one is not at home.

I agree that the standards enunciated by the Supreme Court in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969), reh. denied, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969), are not applicable to this case. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). But there is no need to repeat here the thorough analysis, made by the Court in Chimel, of the development of the law of searches and seizures incident to arrests. The Supreme Court has never approved as incident to an arrest a search as exten-

sive as that conducted in this case.[6] *See generally* Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), in which Mr. Justice Stewart stated, at 456, 91 S.Ct. at 2033:

[T]his Court has repeatedly held that, even under [United States v.] Rabinowitz [339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950,)] "[a] search may be incident to an arrest 'only if it is substantially contemporaneous with the arrest and is confined to the *immediate* vicinity of the arrest.' * * * " (Emphasis in original) [Citations omitted.]

The most extensive search approved by the Court occurred in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), overruled, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *See also* Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). In *Harris*, the searchers spent five hours searching a four-room apartment, located on a single floor, and seized an envelope containing several draft cards illegally possessed by Harris. In upholding the search, the Court reaffirmed the principle that "[e]ach case is to be decided on its own facts and circumstances [citations omitted]." 331 U.S. at 150, 67 S.Ct. at 1101. *See also* Rochin v. California, 342 U.S. 165, 72 S. Ct. 205, 96 L.Ed. 183 (1952). And the difficulty of determining in each case whether a search is unlawful under the uncertain standards applied by the majority in *Harris* was stressed by Mr. Justice Jackson in his dissent. 331 U.S. at 197, 67 S.Ct. 1098. But the Supreme Court later indicated more clearly, in Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969) (per curiam), that the pre-*Chimel* line is not to be drawn significantly beyond *Harris*. In *Von Cleef* the Court held illegal, under pre-*Chimel* standards, a three hour search of a 16 room house which resulted in the seizure of several thousand articles. As the Court stated in that case:

Even the facts of Harris v. United States, *supra*—in which the search of a four-room apartment and the seizure of an envelope containing altered Selective Service documents were sustained on the ground that they were contemporaneous with a lawful arrest —are a far cry from those of this case. * * * [W]e have no hesitation in concluding that the action of the police here in combing a three-story, 16-room house from top to bottom and carting away several thousand papers, publications, and other items cannot under any view of the Fourth Amendment be justified as "incident to arrest."

395 U.S. at 816, 89 S.Ct. at 2052.

There is no convincing precedent sustaining, as incident to a valid arrest, a search of the scope and intensity of that in this case. Appellant was convicted by the use of evidence seized in violation of his Fourth Amendment rights. His reputation as a major criminal figure should not deny him the constitutional protection created for every person. The words of two former Supreme Court Justices are applicable here:

* * * If only the fate of the [appellants] were involved, one might be brutally indifferent to the ways by which they get their deserts. But it is precisely because the appeal to the Fourth Amendment is so often made by dubious characters that its infringements call for alert and strenuous resistance. Freedom of speech, of the press, of religion, easily summon powerful support against encroachment. The prohibition against unreasonable search and seizure is normally invoked by those accused of crime, and criminals have few friends. The implications of such encroachment, however, reach far beyond the thief or the black-marketeer. I can-

---

6. I am aware of no Supreme Court decision which has upheld, as incident to an arrest, a pre-*Chimel* search on a floor different from that on which the arrest was made.

**1260**

not give legal sanction to what was done in this case without accepting the implications of such a decision for the future, implications which portend serious threats against precious aspects of our traditional freedom.

Harris v. United States, 331 U.S. 145, 156–157, 67 S.Ct. 1098, 1104, 91 L.Ed. 1399 (1947) (Frankfurter, J., dissenting).

&ast; &ast; &ast; In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

I would order the issuance of the writ.