**James Hiram FIELDS, Jr., Petitioner,**

v.

**Jesse W. STRICKLAND, Warden, CCI, State of S. C., Daniel R. McLeod, Attorney General of the State of South Carolina, Respondents.**

Civ. A. No. 75–883.

United States District Court,
D. South Carolina,
Columbia Division.

Feb. 15, 1977.

John C. Hayes, III, of Hayes, Brunson & Gatlin, Rock Hill, S. C., for James Hiram Fields, Jr.

Daniel R. McLeod, Atty. Gen., for the State of South Carolina, Columbia, S. C., and Emmet H. Clair, Senior Asst. Atty. Gen., and Katherine W. Hill, Asst. Atty. Gen., Columbia, S. C., for Jesse W. Strickland and Daniel R. McLeod.

ORDER

HEMPHILL, District Judge.

This matter is again before the court on the petition of James Hiram Fields, Jr. for a writ of habeas corpus.[1]  By its Order filed August 15, 1975, the court directed that the matter be deferred pending the outcome of petitioner's request for a writ of certiorari to the Supreme Court of South Carolina, which had affirmed his conviction for murder on April 16, 1975.  Petitioner's attorneys have now informed the Clerk of Court that certiorari was denied by the United States Supreme Court on or about November 3, 1975, and they request renewal of this court's consideration of the matter. Consideration has been delayed by counsel for the various parties who have requested delay or extensions to accommodate counsel or for preparation purposes.

The court will note that the grounds upon which petitioner relies for habeas relief are contained in the grounds upon which he based his appeal to the South Carolina Supreme Court and his petition for a writ of certiorari.[2]  All grounds raised relate ultimately to the circumstances surrounding the appearance of a North Carolina pathologist who testified at petitioner's trial in York County on March 12, 1974.  The witness was examined and cross examined at length, but petitioner now contends he was denied the right of full confrontation because his South Carolina counsel agreed for the expert witness to be excused before his North Carolina attorney—characterized as chief counsel—had a chance to cross examine as to one factual issue now described by petitioner as critical to his defense.

The facts concerning the testimony of the pathologist, and the facts about the crime for which petitioner was charged, tried and sentenced, are set out rather fully in the

1. The original petition was filed May 27, 1975.

2. Filed with the pleadings are a copy of the opinion of the South Carolina Supreme Court, the transcript of record to the court on appeal, briefs of appellant and respondent in that appeal, and the petition for a writ of certiorari,

and the brief in opposition to the petition for certiorari, all of which have been reviewed by this court.  The petitioner's grounds for relief here (paragraphs 6–9) where raised in his appeal (questions I–IV) and in his petition to the United States Supreme Court (questions 1–4).

dissenting opinion of Associate Justice Bussey of the South Carolina Supreme Court.[3] The chronology of the efforts of defense counsel to obtain a continuance of the trial when it was called can be seen from the Transcript of Record, "Proceedings," pages 3–13. This chronology reflects that the case was continued once at the request of petitioner's counsel, set for trial on a date certain, but then declared a mistrial for reasons not apparent on the record, and then reset by special order for trial on March 11, 1974. Although a motion for continuance by Mr. Gatlin of Rock Hill because of the unavailability of Mr. Cooke of Gastonia in another trial was denied by Judge Grimball, the case was carried over by agreement of the Solicitor until the next day, March 12th. When Mr. Cooke of North Carolina was again unavailable, the trial judge denied any further delay notwithstanding Mr. Gatlin's protests that he had been associated for only a limited purpose, and "couldn't possibly render a proper defense . . . because I have not prepared for it." (Tr. 7).

The State presented its case on March 12th and rested. Mr. Gatlin cross examined all prosecution witnesses fully, including the pathologist whose testimony is at the core of the instant petition.[4] When Mr.

---

**3.** This court has carefully reviewed the opinion of the South Carolina Supreme Court in *State v. Fields*, 264 S.C. 260, 214 S.E.2d 320 (filed April 16, 1975) and especially that portion of the opinion in which the distinguished Justice Bussey presented his dissenting opinion as appears in the fourth paragraph of the fourth page of the opinion as rendered in Smith's Advance Sheets (page 18), at page 268 in the South Carolina Supreme Court Reports, and at page 325 in the South Eastern Reporter, Mr. Justice Bussey stated:

> It appears that at the trial in February Dr. Rutland was asked by Mr. Cooke his opinion as to the probable time that elapsed between the infliction of the trauma, which he thought caused the ruptured liver, and the death which followed, and that in response thereto Dr. Rutland testified that in his opinion the trauma occurred anywhere from an hour and a half to two hours before her demise. Other testimony in the record from Dr. Rutland conceded that the ruptured liver could have been caused from the decedent falling down. It is obvious that if the doctor was correct in his opinion as to the time element involved, the assault which Mrs. Hullett testified she observed 30 minutes prior to decedent's death, could not have been the cause of the rupture, a most reasonable inference from all of the evidence being that such occurred when she fell down drunk in the vicinity of the grill.

Furnished to this court by John C. Hayes, Esquire, who is appearing with Attorney Cook in the habeas corpus proceeding in the United States District Court for the District of South Carolina, is a letter of August 19, 1976, stating:

> I enclose, herewith, the Transcript of the portion of Mr. Cooke's cross-examination of the pathologist in the above captioned matter.

and presented an excerpt from cross examination of Dr. Eugene Dell Rutland (at the first trial) by Attorney Cook:

> Q. Do you have an opinion satisfactory to yourself as to how long this rupture to the diseased liver had occurred up until the time that she died? I realize of course this is just guess work, but could you give us an educated opinion as to how long this bleeding took place from the time that she started to bleed until she died?
> A. Well, the tear of the liver was quite extensive and it would take anywhere from half an hour to two hours to exsanguinate her, to bleed to death from the tear in this liver.

It is inconceivable that Mr. Justice Bussey had this testimony before him at the time he published the statement which appears in the opinion. From a long acquaintance, a continuing admiration for Mr. Justice Bussey, his attention to detail and his dedication to justice, this court is convinced that the statement would not have appeared in the opinion had the distinguished jurist had before him the information which was furnished to this court. The information was furnished to illustrate the question which petitioner now contends Mr. Cooke would have asked, the answer which petitioner contends Mr. Cooke would have received as counsel, but which is *not* the answer received by petitioner's counsel; instead of an opinion that the trauma occurred to the deceased anywhere from an hour and a half to two hours before her demise, it is obvious that the pathologist, if examined, would have testified, as he did in the first trial, "it would take anywhere from half an hour to two hours to exsanguinate her, to bleed to death * * *." This places a different exposure on the contentions of the petitioner in this case.

**4.** The testimony of Dr. Eugene Dell Rutland, Jr., who conducted a post mortem examination of the woman petitioner was accused of killing by a beating, appears in the transcript at pages 75–89. Mr. Gatlin informed Judge Grimball that he had no objection to the doctor being excused at the close of his testimony. (Tr. 90). This agreement is significant in this case.

Cooke, whom petitioner describes as his "chief counsel," arrived at the trial on the next day, he moved for a mistrial because he had not had an opportunity to hear the State's evidence against petitioner. The motion was denied. (Tr. 146–148). Mr. Cooke presented the case for the defendant and argued to the jury.

As to be expected in a homicide case, the testimony was in conflict. To say the least, the story is a bloody one. The State presented evidence that during the afternoon or early evening of July 5, 1973, the petitioner struck the decedent about her body with his fist and pushed or shoved her into a chair repeatedly. One witness testified that he forcibly pushed her into a chair three times at the Grill where she worked for petitioner. Two other witnesses testified that they saw petitioner striking the decedent while they were in his car between his Grill and her trailer home, located only a few miles outside Clover, South Carolina, just across the North Carolina line. The decedent bore several marks of a physical beating when her body was examined, and at least three persons other than petitioner saw her in a bruised and apparently injured condition after she and petitioner left his Grill and ultimately went to her trailer home. Petitioner himself acknowledged that he "smacked" her while driving her home in his car. (Tr. 166). However, petitioner testified that the decedent had fallen twice before they left the Grill to go to her home, once while stepping out the front door of the place, and once earlier when she had tried to put a drunken tenant of his into bed.

Although the pathologist could not fix the time of death (Tr. 78), at either trial, he had established as the cause of death "bleeding to death which resulted in trauma to the liver." (Ibid.) [5] He acknowledged that the abnormal condition of the dead woman's liver would have made it more vulnerable to a traumatic injury than a normal liver (Tr. 83), but he insisted that the rupture of the liver would not occur spontaneously. An outside force would be necessary (Tr. 84), and on cross examination he agreed that an involuntary fall might cause trauma and injury. (Ibid.)

Attorney Gatlin did not ask the pathologist for his opinion as to how long decedent might have lived after her liver was ruptured. This omission is the principal cause of the instant case. Petitioner asserts that at the earlier mistried case, the doctor had said that death would follow a traumatic injury to decedent's liver in from one and one-half to two hours.[6] (Tr. 223–226). After Mr. Gatlin overlooked asking the same question at the second trial, petitioner's attorneys sought to have Judge Grimball recall the pathologist.[7] The effort failed, and the doctor would not or could not come back for further cross examination. The Solicitor would not stipulate the time it would take for death to follow injury, so petitioner's attorneys sought to have the transcript of the doctor's testimony at the first trial read to the jury. Judge Grimball denied the request. (See Tr. 223–239). This denial, plus the earlier denial of a continuance, forms the basis of the instant petition.

█ The Supreme Court of South Carolina divided four-to-one on the questions petitioner relies upon here, and as noted earlier, the United States Supreme Court has denied review.[8] It would appear, therefore,

---

5. According to the doctor, the liver of the dead woman was abnormal in that about 80% of it had been replaced by lipid material. She had been drinking on the night she died, and he expressed the opinion that excessive alcohol consumption could cause such condition. (Tr. 85)

6. If the pathologist had testified as he did in the first trial the answer would have been "from half an hour to two hours" [see footnote 3 supra].

7. Judge Grimball was not specifically asked to follow Section 26–301 et seq. of the South Carolina Code, which had apparently been used to obtain Dr. Rutland's presence earlier. See pages 6–8 of Brief of Respondent to South Carolina Supreme Court.

8. No significance can be attached to the denial of certiorari. See e. g., Agoston v. Pennsylvania, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619 (1950); and United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923).

that what petitioner is seeking here is but an additional appeal of his case. Such is not the purpose of a federal habeas corpus. *Grundler v. North Carolina*, 283 F.2d 798 (4th Cir. 1960),[9] certiorari denied 362 U.S. 917, 80 S.Ct. 670, 4 L.Ed.2d 738 (1960). The question presented is merely whether correct constitutional principles have been applied in petitioner's trial. If so, he is not entitled to relief. *Grundler*, supra; *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

It is perhaps worthy of note that petitioner has not filed here any transcript of the testimony Judge Grimball was asked to have read to the jury. Reference to this omission does not imply any doubt that petitioner's attorneys have made a faithful representation to the South Carolina courts that Dr. Rutland testified as they recall he did about the time between the laceration to the decedent's liver and her death.[10] It just seems that a transcript would be the proper vehicle to utilize in attempting to show an error of alleged constitutional magnitude.[11]

There was disagreement at trial as to the time when petitioner and decedent were seen together from the time they left petitioner's place of business on July 5, 1973 until they arrived at decedent's trailer home, located a relatively short distance away.[12] The State's evidence reflected that petitioner pushed or shoved the decedent before he closed his Grill, and that he beat her with his fists while they were in his car between the Grill and her North Carolina residence. The petitioner's evidence reflected that the decedent fell twice before leaving the Grill, and that petitioner and the decedent were seen riding together that evening near dark at which time the decedent threw up her hand to acknowledge the greetings of two persons who testified that they saw the two together in petitioner's car. A brief recap of the times as testified to by various witnesses will reflect the time span involved in the testimony.

A State witness (Sexton) saw the petitioner and a woman "fighting" (Tr. 50) in petitioner's car. This sighting was fixed at between 6:30 and 8:00 P.M. (Tr. 53).

Another State witness (Hullett) saw a man beating a woman in a blue car beside old highway 321 out of Clover, and again off the highway on a dirt road. She fixed the time as a little after 8 P.M. (Tr. 58–63). On cross, she indicated it may have been closer to 8:30 P.M. (Tr. 64–65).

Another State witness (Helms) saw petitioner knock the decedent into a chair three times before the petitioner closed up his Grill. This witness didn't fix a time except to say the incident occurred a short while after she arrived at the Grill while darkness was approaching. (Tr. 91–95).

A Clover police officer saw petitioner and decedent at the Grill in petitioner's car at 8:30 P.M. (Tr. 120). The woman was in the car but she did not move. Petitioner told the officer the woman had been in a wreck (Tr. 122), but the officer received no report of a wreck between 8 P.M. and midnight on July 5, 1973.

The daughter of the decedent testified that petitioner and her mother drove up to their trailer home at about 8 P.M. on July 5, 1973 (Tr. 16). They sat in petitioner's automobile approximately five minutes, and then departed in the vehicle. About twenty minutes later, they returned to the dece-

---

9. In *Grundler*, the late Chief Judge Sobeloff wrote for our Court of Appeals that even if they disagreed with a state court's resolution of issues concerned with state law and procedures, "[W]e could not intervene by habeas corpus, when the alleged errors are of a character that cannot reasonably be said to involve a deprivation of constitutional rights . . . The role of a federal habeas corpus petition is not to serve as an additional appeal." (283 F.2d at page 802)

10. See pages 5, 10 and 11 of petition for certiorari; pages 14–15 of brief of appellant on appeal to South Carolina Supreme Court; Tr. 146–148.

11. Since petitioner's counsel has furnished the pertinent excerpt it is unnecessary that the whole transcript of Dr. Rutland's earlier testimony be filed.

12. At one point the distance was said to be around seven miles. (Tr. 236, f. 943)

dent's home. The decedent was alive although she complained that she was sick. The petitioner told this witness her mother had been in a wreck with a person named Hoover, and that Hoover had been taken to a VA hospital.[13] The witness said that her boyfriend and petitioner removed her mother from the car and carried her into her trailer home where she was placed in her bed. The petitioner came to this witness a few minutes thereafter and told her that her mother had stopped breathing. The witness recalled that her mother died about five minutes after petitioner brought her home. This would put the time of death at between 8:30 P.M. and 9 P.M. (See Tr. pp. 16–25).

The daughter's husband, who was her boyfriend, referred to earlier when the petitioner brought the decedent home, testified for the State. His testimony was a substantial corroboration of his wife's account of the events at the trailer home on the evening of the death of his wife's mother. (Ronald Farmer, Tr. 34 et seq.)

The defense testimony was in some conflict where times were involved. Petitioner himself said he returned to his place of business about 6:30 P.M. on the date in question and found the decedent was drinking excessively. He testified he sent her downstairs to check on a drunk friend of his around 7 P.M. She called petitioner to help her put the friend into a bed, and according to petitioner, she and the drunk man had fallen to the floor when petitioner came to the room under his Grill. Petitioner left the Grill again and returned "before eight." (Tr. 162). He said they left the Grill because the decedent was drunk and he simply closed up the place. She allegedly fell as they stepped out the front door of the place. He fixed the time of their departure as shortly after his return "before eight."

They drove to Bowling Green from the Grill, and stopped once on the road where he "smacked her" (Tr. 166) because she had grabbed the steering wheel. They drove back to the Grill from Bowling Green. They had been at the Grill a few minutes ("not long," was his testimony) when two officers pulled up. They had a brief conversation and petitioner left. He testified that he "turned and went toward Clover and went across there and hit 321 and went to the trailer." (Tr. 168). When they got to the trailer, they left and "rode up to South Gastonia" because the decedent didn't want her daughter's boyfriend to see her intoxicated. They turned around in South Gastonia and returned to decedent's trailer. He estimated the time from his departure from the trailer to his return from South Gastonia as seven to ten minutes. (Tr. 170). They stopped for the decedent to vomit before driving from the highway into the trailer lot. Although petitioner said he could not fix the time he carried the woman into the trailer, he stated it was after dark. He had used his automobile lights "maybe thirty minutes" before reaching the trailer. (Tr. 173).[14]

On cross, petitioner testified he took two drinks after he and the decedent left the Grill. (Tr. 180). He estimated the elapsed time between his departure with decedent from the Grill and her becoming ill and vomiting near the trailer as "thirty minutes to an hour . . . wasn't over thirty or forty-five minutes." (Tr. 197).

J. R. Moore testified for the petitioner. He placed the time of petitioner's closing of the Grill as "between seven and seven-thirty" on cross examination. (Tr. 211).

T. C. Barnham testified for the petitioner also. He testified he saw petitioner and the decedent, Marie Hampton, riding toward

13. Hoover is a friend of petitioner who was occupying a room beneath petitioner's Grill on the date of the homicide. Petitioner testified that Hoover was suffering from "DT's", and that decedent was sent to Hoover's room to assist him. Petitioner said that Hoover and the decedent fell when the woman tried to put Hoover in bed. This was the first of two falls by decedent that petitioner testified about.

14. Although the record is not specific, presumably daylight saving time was observed in Clover on July 5, 1973. The reference by petitioner to arriving at the trailer "right after dark" after driving around with his lights on for a half hour conflicts with other defense testimony, as will be seen.

Gastonia on highway 321. He estimated the time as "after six." He said, "[I]t was getting over in the afternoon, but it was plenty of daylight though." (Tr. 217). He later placed the time as "somewhere around seven or seven-thirty." (Ibid.)

H. B. Phillips testified for petitioner that he saw petitioner and the decedent on 321 north "before dark." He said it was "after six" (Tr. 220), and later said, "I'd say seven-thirty . . . I'm not sure exactly what time it was." (Tr. 221). It was light enough for him to recognize and speak to both of them across the median-divided highway. On cross, he said it was "long before dark" when he saw them.

It can be seen from the foregoing synopsis of the times mentioned that petitioner's witnesses tended to contradict his own testimony about the time of day and the daylight conditions when he drove with the decedent toward Gastonia from Clover on the afternoon or night of the homicide. It is against this backdrop that his grounds urged for habeas relief must be viewed.[15]

The instant case presents questions of law rather than issues of fact. Therefore, no hearing is indicated on the record. *Barker v. Ohio*, 330 F.2d 594 (6th Cir. 1964); *Grundler v. North Carolina*, supra; *Townsend v. Sain*, supra.

■ In reviewing a request for federal habeas relief based upon alleged errors committed during a state trial, it is necessary to keep in mind that an error in a state trial does not rise to the level of a Four-teenth Amendment violation unless the alleged error so infects the entire trial that a resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). While federal appellate courts have supervisory authority over United States District Courts, and hence can reverse a federal case for retrial on grounds not relating to an alleged constitutional error, such supervisory authority over state courts has never been structured into the Constitution or federal law. Therefore, a state trial must be so "fundamentally unfair" as to amount to a denial of due process before federal habeas relief can be appropriately applied. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).[16]

■ Application of this standard to the record here shows no error of constitutional magnitude. The trial judge in the exercise of his discretion denied a continuance. When it is kept in mind that the case had been continued once at the request of petitioner's attorneys, and then set for a second time by special order, that petitioner's Rock Hill attorney had been retained from the beginning and had participated in the preliminary hearing and the earlier mistried case, that the North Carolina attorney's investigator sat with petitioner's attorney at the trial, and that the request for a continuance was raised only when the case was called for trial rather than before,[17] the denial of another continuance loses any appearance of being arbitrary.[18] Although he

---

**15.** No digest of the other evidence introduced at the trial is necessary in view of the limited basis for petitioner's collateral attack of his conviction. With both counsel present, petitioner specifically requested Judge Grimball that the lesser offense of manslaughter not be charged to the jury. The Solicitor thought a manslaughter charge was appropriate. See Tr. 239–240. No contention is made here about this election, but it was raised in the earlier appeal to the South Carolina Supreme Court.

**16.** Our Court of Appeals has frequently alluded to the supervisory capacity of an appellate court over federal trial courts. The most recent reference was in *Shaffer v. United States*, 528 F.2d 920, 922 (4th Cir. 1975) citing

*United States v. Holley*, 502 F.2d 273 (4th Cir. 1974).

**17.** Judge Grimball thought the belated request was "strange." (Tr. 7)

**18.** In the cold light of the record in a hindsight view, it might be arguable that Judge Grimball should have continued the trial until Wednesday, because the trial took only two days. However, all indications then pointed to a longer trial. The defense attorney himself told the judge the defense would call fifteen or more witnesses. (Tr. 7) Judge Grimball was in a special term, and he had a jury and witnesses available, including the expert witness who had come to court for a third time,' apparently, under compulsion. See *Avery v. Alabama*, 308

had earlier expressed concern about his lack of familiarity with the case, attorney Gatlin handled the case well, according to the record of the trial. He cross examined the prosecution witnesses fully, including repeated recross of the pathologist, Dr. Rutland. Cf. *United States v. Marine*, 413 F.2d 214, 218–19 (7th Cir. 1969), certiorari denied 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493 (1970), where an attorney who said he was unprepared to try a case was commended by the court for his astute and conscientious efforts on behalf of a defendant. The trial record here reflects similar credit upon Mr. Gatlin's efforts. That petitioner was not acquitted does not control the issue. See *Mitchell v. United States*, 104 U.S.App.D.C. 57, 259 F.2d 787 (1958), certiorari denied 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958). Judge Prettyman wrote:

> Mere failure to achieve acquittal is no part of a court's consideration of the work of a trial lawyer. His obligation is to achieve a fair trial, not to see that his client is acquitted regardless of the merits . . .

The fact that Mr. Gatlin during the cross examination of Dr. Rutland did not ask a specific question he *might* have asked is not sufficient to warrant the overturn of a conviction in a habeas action. *Horne v. Peyton*, 356 F.2d 631, 633 (4th Cir. 1966), certiorari denied 385 U.S. 863, 87 S.Ct. 119, 17 L.Ed.2d 90 (1966). See also *Parson v. Anderson*, 354 F.Supp. 1060, 1073–74 (Del. 1972), aff'd 481 F.2d 94 (3rd Cir. 1973), certiorari denied 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479 (1973); *cf. United States ex*

*rel. Drew v. Myers*, 327 F.2d 174, 181 (3rd Cir. 1964), and authorities therein cited.[19]

In his briefs filed in connection with his earlier appeals, petitioner relies principally upon *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), and *Giacalone v. Lucas*, 445 F.2d 1238 (6th Cir. 1971). *Ungar* is inapposite on the facts.[20] *Giacalone* contains language which petitioner seizes upon for argument in his appellate briefs, but the holding in that case was against a state prisoner who, not unlike petitioner, had competent counsel to defend him even though his lead counsel was undergoing hospital treatment. There was no showing made in that case that the prisoner received ineffective representation; no such showing has been made here by petitioner.

■ The contention that petitioner was denied his right to confront and cross examine the pathologist, Dr. Rutland, is belied by the record. The refusal of the trial judge to permit Dr. Rutland's testimony given at the earlier trial to be read after he testified at the later trial is not a constitutional issue; this matter was concerned with state criminal procedure. The South Carolina Supreme Court has answered it adversely to petitioner's contention, and that court's decision about state procedure is not reviewable in this court. *Grundler v. North Carolina*, supra. The same conclusion would be applicable to the contention that Judge Grimball should have directed the North Carolina doctor to return to court for the third or fourth time so he could be asked one more question by petitioner's attorney

U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940), where the late Justice Black wrote: ". . . In the course of trial, . . . many procedural questions necessarily arise which must be decided by the trial judge in the light of facts then presented and conditions then existing. Disposition of a request for continuance is of this nature and is made in the discretion of the trial judge, the exercise of which will ordinarily not be reviewed. . ." See also *Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166, 175–76 (1941).

19. The instant case is not comparable with a case where an attorney's acknowledged incompetence suggests possible sanctions by the

court, as in *Cross v. United States*, 392 F.2d 360, 367 (8th Cir. 1968).

20. In *Ungar*, Justice White cited *Avery v. Alabama*, supra, as authority for the traditional discretionary authority of a trial judge in granting or denying continuances. *Chandler v. Fretag*, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954), was cited in criticism of "myopic insistence upon expeditiousness in the face of a justifiable request for delay . . ."

Factually, *Avery v. Alabama* and *Chandler v. Fretag* are not apposite to petitioner's case, either, although the latter case was a habeas action.

who asked the expert eighty-seven questions on cross and recross before agreeing to the doctor's excuse by Judge Grimball.

It occurs to this court that petitioner has consistently argued, before the Supreme Court of South Carolina, in his petition for certiorari, and argues here, on the basis of the belief that the doctor at the first trial had testified that the injury that caused the murder victim's death "occurred anywhere from an hour and a half to two hours prior to her demise." If the testimony had been read to the jury, the testimony would not have so revealed, and therefore would not have given the defendant the benefit of what petitioner now claims the testimony would be. The testimony is different from what the petitioner claims it is, and in view of the nature of the case, could well be more detrimental to the petitioner than helpful. It may be that Mr. Gatlin knew this at the time, and did not pursue the questions for that reason. This court is not willing to surmise about it, but it seems that authorities are being presented to the court based on a false premise, and totally lacking in factual support in the record. This is in no disrespect of either Mr. Cooke or Mr. Gatlin, both of whom are able, distinguished and renowned lawyers, but sometimes one's recollection is not as accurate as the recorded word.

The petition as submitted does not state a claim for federal relief. The record shows that the jury believed the State's witnesses, or some of them, and found petitioner's version of the events of July 5, 1973 to be unbelievable.[21] The doctor did not establish the time of death, and had he testified that death would have followed a traumatic injury to decedent's liver by from ninety minutes to two hours (which he did not testify as he gave the time span from a half an hour to two hours), there is no way petitioner can demonstrate that the outcome of the trial would have been any different.[22]

This court therefore directs that the petition be dismissed for the foregoing reasons.

AND IT IS SO ORDERED.

---

21. The probative strength of the state's evidence is not a federal constitutional issue. *Williams v. Peyton*, 414 F.2d 776, 777 (4th Cir. 1969). The factfinding process is not transferred to a federal judge where a state jury convicts a defendant who later seeks federal habeas relief. *Holloway v. Cox*, 437 F.2d 412 (4th Cir. 1971).

22. It could very well be true that *had* Mr. Gatlin asked Dr. Rutland the "omitted" question, and *had* the doctor answered it as petitioner says he would have done so, petitioner's attorneys *might* have changed their trial tactics. No one will ever know this, however, and such speculation is not appropriate in a habeas case unless the "harmless error" rule of *Chapman v. California* applies. 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). I do not see this rule as applying here, where a question was never asked at all. The only *possible* error committed by Judge Grimball was the denial of the continuance on Tuesday after he was assured North Carolina counsel could appear the next day.